Filed 12/3/25  L.S. v. P.T. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| L.S.,<br><br>        Plaintiff, Cross-defendant and Respondent,<br><br>v.<br><br>P.T.,<br><br>        Defendant, Cross-complainant and Appellant. | A171575<br><br>(San Francisco City & County Super. Ct. No. FDV-23-816772) |

The trial court granted L.S.'s request for a domestic violence restraining order (DVRO) against her husband P.T. and denied P.T.'s request for a DVRO against L.S.[1]  P.T. appeals both rulings, the first only as to the inclusion of the parties' children as protected parties.  We affirm.

## I. BACKGROUND

L.S. and P.T. married in Nepal in 2018.  In 2021, they moved to California, where their twin girls were born in September 2022.

---

[1] Such orders are governed by the Domestic Violence Prevention Act (DVPA), Family Code section 6200 et sequitur.  All further undesignated statutory references are to the Family Code.  We refer to the parties by their initials to protect L.S.'s privacy, in accordance with rule 8.90(b)(1) of the California Rules of Court.

1

## A. *Life with P.T.'s Family in Nepal*

In Nepal, L.S. "had to live with" P.T.'s "extended big family." She had to "do a lot of work," including "cleaning, cooking, [and] washing the dishes," she "had to wear . . . certain clothes all the time," and she was not allowed to express her opinions or "to eat eggs." P.T.'s family would "get angry at" L.S. and "shame [her] family" in connection with her behavior. Such "controlling" treatment was common in Nepal.

In 2019, P.T. went to work in Singapore for four months, leaving L.S. with his family. According to L.S., she and P.T. had agreed to talk daily or every other day, but P.T. was uncommunicative while he was away. They quarreled about this. From Singapore, P.T. messaged L.S., " 'You will be sorry when I'm fucking dead. If I die of a heart attack it is your fault.' " She feared he was suicidal.

After P.T. returned to Nepal, "he got very isolated. He started shutting himself in [a] room for almost two years." Late one night, P.T. "came out of the shower in his towel, and he got really angry, and . . . accus[ed] his uncle, who lived two floors down," of intentionally "stopp[ing] the water flow." "Suddenly, he got so enraged" that he went to his uncle's home and "apparently shattered a glass door . . . with his hand." "When his parents brought him upstairs," he "was covered in blood and glass." L.S. was "terrified," but helped P.T.'s parents to "clean[] his wound" and remove "the glass from his body."

One day in December 2019, L.S. was "very sick" with a "102 fever," but was cleaning the kitchen because she "had to." She brought P.T. his lunch and "he was already very angry," with "red and big" eyes. He said, " 'Start packing your things and leave,' " and L.S. "didn't understand." P.T. said, " 'I'm going to count to five, if you don't start packing your things, I'm going to

throw the sofa off the third floor.' "  After counting to five, P.T. "threw the sofa from the third floor into the family courtyard," "locked [L.S.] out of the room," and said she needed to leave.  L.S. was "terrified."

According to L.S., P.T.'s parents sought medical treatment for P.T., which she supported.  L.S. presented uncontradicted evidence that in Nepal, there is a legal process by which family members can consent to mental health treatment for a person with "mental illness or any impairment of mental soundness."  A psychiatrist prescribed P.T. medication through this process after meeting with his mother and L.S.  Unbeknownst to P.T., his mother would mix the medication with food and administer it to him.  L.S. testified that on two occasions, P.T.'s mother prepared the medication with food and told L.S. to give it to P.T., and she complied.  After three months of this surreptitious medication, the psychiatrist instructed the family to inform P.T. of the treatment, and P.T.'s father told him.  P.T. "just left and went to his room upstairs," and he texted L.S. that he wanted to stop the medication.

Over the next few months, the Nepalese psychiatrist continued to treat P.T. with P.T.'s knowledge and direct participation, until L.S. and P.T. moved away.  The psychiatrist "very specifically said there [was] a danger of relapse if [P.T.] stop[ped] medication abruptly," and P.T. needed to keep taking his medication "for at least a year."

## B.  The Parties Move to California, Have Twin Girls, and Separate

In the spring of 2021, the parties moved to San Francisco.  Several months later, P.T. flushed the medication they had brought from Nepal down the toilet, and L.S. told his parents because she was "really scared."  At his parents' request, the Nepalese psychiatrist e-mailed P.T.'s doctor in San Francisco about his medical history.

P.T. stated in a declaration that L.S. "pressured [him] to impregnate her since [they] married, even though [he] told her that [he] wanted [them] to be financially more stable and needed a year or two to be ready." He "eventually caved to [L.S.]" with respect to having children. L.S. denied pressuring P.T. to have children and explained they had agreed to do so before getting married, then agreed to "have babies in America not in Nepal because . . . it's a better country."

In early January 2022, L.S. and P.T. returned "from a nice vacation in Joshua Tree," and her parents called to wish them a happy new year. L.S.'s mother wished the couple "good health" and a "growing family." L.S. testified that the day after her parents' call, P.T. "woke up angry" and began to complain about the "kitchen not being tidy." He threw "containers on the floor and in the trash, started shouting," and said "like, how dare your mom say things like this." L.S. "got scared that he would do something" and "went to [her] friend's place in San Jose." When she was on the train to San Jose, P.T. messaged her to " 'move[] out permanently' " because he did not " 'want to have kids with [her].' " L.S. replied that she would " 'come back when [P.T. was] ready to talk,' " and P.T. responded, " 'Come back when I'm dead . . . when I lived a happy life without you in it.' " P.T. tore up photographs of himself with L.S., removed photographs of L.S.'s family from their frames, "threw" her "religious items," and then "took pictures of those torn things and sent them to [her]." L.S. was "very hurt and scared."

"Around [the] end of January" 2022, L.S. learned that she was pregnant. She had "a hard pregnancy," and P.T. "would get angry if [she] said [she] was not feeling well." He would "say things like, 'Every woman gets pregnant, deal with it.' " During one text message exchange, L.S. said she was not feeling well enough to do housework and felt " 'a lot of anxiety

4

and stress' " because of P.T.'s " 'agitation.' " P.T. replied, " 'None of these things would be an issue if you were organized in the first place, maybe spend sometime [*sic*] reflecting on what you could do different instead putting all of the blame on me.' " He continued, " 'Please stop feeling sorry for yourself. Pick yourself up and get on with your day. You will soon have two more humans to take care of.' " P.T. would "get angry" and "shout verbal abuse" if L.S. invited friends or family to their home, once locking her out of the bedroom so that she "had to sleep on the sofa." L.S. stopped sharing her feelings with P.T. and would go to her "friends and neighbors to hang out with them or even to nap."

L.S. and P.T.'s twin daughters were born prematurely and spent a few days in neonatal intensive care. P.T. was "engag[ed]" with the twins "in the beginning," "helping" and "taking care of the babies' feeding." But after his five-week parental leave ended, this "suddenly changed."

L.S. testified that on a day less than two months after she gave birth, she was exhausted from constantly breastfeeding and caring for the twins. When P.T. asked her if something was wrong, L.S. said she was jealous that P.T. could "sleep eight, nine hours," play chess, and go for runs, while she was not able to rest or sleep. P.T. became "like dangerously angry suddenly." L.S. apologized and said she just needed to sleep. After she fell asleep, P.T. woke her by calling her "an evil witch" and "a parasite," while "very angry." "His eyes were red, and he was cursing and banging things and banging the door, and then he shouted at" L.S., "and then just slammed the door and left."

L.S. messaged P.T. that she was " 'sorry' " and " 'didn't mean to upset [him].' " In reply, he repeatedly cursed L.S. and her family, called L.S. a " 'fucking curse to [his] life,' " and criticized her for complaining when she had " 'everything paid for, . . . world-class health care, . . . live[d] near the best

urban parks and [had] all of that without having to work or worry about how to pay for all of this.'" During the hours that followed, P.T. texted L.S. demands to "'get a job'" and pay for half of the family's expenses, and he repeatedly called her derogatory names, including a "'dumb piece of shit,'" "'a dark, horrible negative person,'" and a "'parasite.'" L.S. was "very scared and terrified," but could not "go far" because her C-section incisions were still healing, "so [she] went to [her] neighbor," L. She was with L. as she received some of P.T.'s angry text messages, and L. gave her a key to his apartment.

In January 2023, L.S. and P.T. were making coffee in the kitchen, getting ready to take the twins to a medical appointment. L.S. suggested that P.T.'s mother (who was staying with them) could cook simpler meals so she could spend more time with the twins. L.S. saw P.T.'s "same red eyes" and "anger face" and he said, "I'm going to throw this at you if you don't stop talking." He then threw "a glass jar with coffee beans . . . towards" L.S., and it "shattered [on] the wall next to [her], and all of the glass and all of the coffee beans w[ere] all over the sink, over the babies' bottle parts, . . . all over [L.S.], [her] hair, [her] clothes and [her] nursing bra." L.S. was "terrified," and P.T. "started calling [her] . . . parasite, dumb fuck and stuff like that." She called L. because she thought P.T. would "do something else." L. came to L.S. and P.T.'s apartment; P.T. asked him to leave, but he stayed at L.S.'s request. P.T. "just left the room and went to . . . the bedroom and locked himself [in]."

L. agreed to take L.S. and the twins to the doctor and went back to his apartment to get ready. L.S. took a shower and was "scrubbing the glass off and off and off many times because [she] was scared that the babies would get hurt if the glass pieces were still on [her] breast."

6

Upon learning that L. had agreed to go to the doctor, P.T. "suddenly . . . decided" he would go, but L.S. "was scared to go with him" and asked L. to "at least be there until [they were] in the car." It was storming, and L.S. put covers on the twins' car seats, but P.T. objected and "ripped" the covers off. L.S., P.T., and L. went downstairs to the lobby with the twins, then L. went back upstairs to get an umbrella. When L.S. again started to put the covers on the twins' car seats, P.T. "came from behind and he held both [her] arms and started shaking [her] violently and said something like, you're making me mad. You're making me crazy." As L. came back downstairs, P.T. "ran out the door and he just left." L.S. felt "very sad because [her] babies were watching" and "saw" what had happened. The next day, L.S. told her pediatrician about this incident and filed a police report.

## C. Trial Court Proceedings

In March 2023, L.S. filed this action seeking a DVRO and obtained a temporary restraining order against P.T. She left home with the twins while P.T. was at work. L.S. sought an order requiring P.T. to move out of their home and granting L.S. sole custody of the children, with supervised visitation to P.T. She filed for divorce, and those proceedings were ongoing at the time of the trial court hearing. In May 2023, P.T. filed his own request for a DVRO protecting himself and the twins against L.S.

At the trial court hearing, L.S. testified about P.T.'s abuse as described above. She explained that after she separated from P.T., the twins had seizures and were hospitalized multiple times. L.S. updated P.T. through her lawyer and agreed he could visit the twins if family or friends supervised, but P.T. rejected this option when L.S.'s sister and parents were the only ones available to supervise. Hospital workers were "very angry" at L.S. because P.T. came to the hospital to request unsupervised visitation, and threatened

7

to call the police if P.T. returned. This was "very, very, very stressful because it distracted [L.S.] and the staff . . . from [her] daughters' treatment."

L.S. called her neighbor L. as an additional witness. L. said he felt "[c]onflicted" about testifying since he was friends with both parties. He recounted how L.S. came to his apartment when the twins were six weeks old, "having trouble breathing and very panicked." She "just sat and cried for a while," and when L. asked what was wrong she said, "[P.T.], he is not good to me." She appeared to be having "a panic attack," and eventually "gave a kind of broad description of" how P.T. would not "leave [her] alone" and was "very angry." L. could see messages from P.T. appearing on L.S.'s phone. He was "[s]hocked and sad" because he knew P.T. "to be a very good person," but found the messages "unusually extreme for a fight," and was "concerned" by their "tone" and "the relentlessness of them." L. offered L.S. a key to his apartment "in case she ever needed to come in the same type of situation if she felt unsafe for her or the babies." He asked a friend who was a domestic violence counselor for advice, and she advised him to write down everything that he was experiencing and feeling. He began taking contemporaneous notes.

L. described the call he received from L.S. in early January 2023. No one responded when L. spoke into the phone, but he heard voices in the background and "realized that maybe [L.S.] was just calling [him] to let [him] listen." Instead, L. "went over and knocked on the[] door" to L.S. and P.T.'s apartment. P.T. opened the door and asked L. if he heard something, and L. said no, he was "just checking . . . if everything's okay." P.T. said everything was okay, but L. saw "a mess within the kitchen," including "broken glass," and L.S. "was trembling and picking [glass] out of her hair and sweater." P.T. "assured [L.] that they just had an argument and that" P.T. had "thrown

something but everything was okay, . . . and [L.] could leave." L.S. encouraged L. to stay while P.T. continued to urge him to leave. P.T. then went to his room. L. tried "to clean up quickly," but first, he "took several photos of the kitchen situation to document," which were admitted at the hearing.

L. agreed to help L.S. carry the twins downstairs so they could go to their medical appointment. He went back to his apartment to get ready and texted P.T., offering to talk the situation through "as a friend." When he returned to L.S. and P.T.'s apartment, L.S. asked him to drive her and the twins to the doctor because P.T. did not want to go. L.S. and P.T. argued about whether to put covers on the twins' car seats, and P.T. "ripped off the covers," which L. viewed as "an extreme and angry reaction" to "a generally wise idea" to use the covers in bad weather. L. went downstairs alongside L.S. and P.T. and was certain that L.S. was not following P.T. or haranguing him. Then he went back upstairs to get an umbrella. When he came back downstairs, L.S. was "visibly shaken up, crying, and standing next to the baby carriers," and P.T. was "in the back corner of [the] lobby . . . with his hands on his hip." L. asked L.S. if she was okay and she said P.T. had "pushed her" and "shaken her." L. asked P.T. if he had pushed L.S. and P.T. said "she pushes me into madness" and "I hate her."

L. drove L.S., her mother-in-law, and the twins to the doctor and had a long conversation with P.T. at a cafe later that afternoon. Several of P.T.'s comments during that conversation "alarmed" L. When L. said "there should be no tolerance" for "throwing . . . things or for shaking your spouse," P.T. responded, "[S]ometimes men just need to be violent to protect their family." P.T. also "repeatedly tried to explain . . . that if" L. was "feeling sympathy" for L.S., he should understand that she was "faking a lot of this, that raising

9

children is just not that hard.  She's not that tired.  She's . . . doing this to get sympathy" and L. was "falling for it."  L. was also "alarmed" when, after P.T. said he was "providing a lot" so the twins could live "in the United States where" they would have "freedom . . . they wouldn't have in Nepal," P.T. rejected the suggestion of divorce because his and L.S.'s families were "very conservative" and concluded that "[t]he babies and [L.S.] need to go back to Nepal."  P.T. also rejected L.'s suggestion of therapy and said L.S. was the one who needed therapy.

L.S. also presented testimony by a professor of women's and gender studies, who was designated without objection as an expert in gender issues in Nepal.  The expert explained that in Nepal, it is common for a woman to move to her in-laws' home after marriage.  A daughter-in-law "is subordinate . . . to her father-in-law, her mother-in-law, and her husband," and also to "the wives of her husband's older brothers."  A new daughter-in-law has the least power, and her "most direct relationship of power traditionally . . . is with her mother-in-law, who is more or less in charge of the household domestically speaking."  If a daughter-in-law disobeys an order from her in-laws, "[s]he might be reprimanded verbally and she could even be reprimanded physically," although this is formally illegal.  A disobedient daughter-in-law "could have resources, like food, withheld from her if things were very bad" or become the subject of gossip impacting the "status and honor" of her whole family, with "lots of both practical and emotional repercussions" for the family.

L.S. submitted a declaration by the psychiatrist who treated P.T. in Nepal, which the trial court admitted per the parties' stipulation.  The psychiatrist explained that he prescribed P.T. medication with informed consent from his family, which is a legal and common practice in Nepal.

After a month or two, he met with P.T. and P.T. confirmed his symptoms, was aware of his treatment and associated risks, "accepted everything and acknowledged that he had improved." During the following months, the psychiatrist continued to meet with and treat P.T., reducing and eliminating one medication but maintaining another. After P.T. moved to the United States, the psychiatrist urged him to continue his medication and e-mailed his San Francisco physician at his parents' request.

P.T. relied on his own testimony at the hearing and did not call any other witnesses. He testified that discovering he had been medicated without his consent was "devastating," shocking, and confusing, and made him feel like he "had zero agency." He "felt fear . . . about what else might she do" (*sic*) and "decided that [he] couldn't live in [Nepal] . . . if people could get away with that." He "was getting pressure to impregnate [L.S.]," but "couldn't perform" due to the side effects of the medication, "and she would even, like, throw comments at [him] that were sort of like degrading in nature" even though she knew about the medication and he did not. After P.T. told L.S. that he did not want to take medication, "she kept pestering" and "pressuring [him] to go see the psychiatrist," and he went because he felt he "ha[d] to comply." Once, L.S. told him that if he was not "nice to [her]," she would not "say nice things to the psychiatrist." L.S. told P.T. he "should be grateful to her for medicating" him because it "literally saved [his] life." Once, she woke him by whispering in his ear that he was an "ungrateful asshole."

P.T. testified that throwing the glass in the kitchen was his "poor attempt to create space between [L.S.] and" himself, and explained that this was "a pattern of behavior" that "[L.S.] had very much trained [him] for" by "badger[ing]" him relentlessly "until either she got what she wanted" or an

11

"event happened that made it stop." P.T. stated that he did not throw the glass in L.S.'s direction. After he threw the glass, he felt trapped in the kitchen because L.S. stood in the door "yelling at [him]," and "there had been occasions where she would block the . . . exit to a room" and when P.T. would "grab the doorknob, she would grab the doorknob; and when [he] forced the doorknob and opened the door, she would drop to the floor and grab [him] by [his] feet."

P.T. denied "that [he] grabbed [L.S.] and shook her violently" when they took the twins to the car, and explained that they had "disagree[d] about whether the [car seat covers] when [he] carried them down from the fourth floor should be on or not." P.T. continued, "My argument was that I'm the one that's going to carry both my twins and I want to have a direct line of sight on them. She just didn't listen or agree." Contradicting L.'s testimony, he claimed that as he and L.S. went down the stairs with the twins, "she was just right behind me. Just haranguing me."

On cross-examination, P.T. acknowledged that the glass jar he threw broke over the sink approximately three and a half feet from where L.S. was standing. He also acknowledged throwing a piece of furniture in Nepal when he was frustrated. He admitted sending L.S. text messages calling her an evil witch, a parasite, stupid, and incapable of taking care of babies, but explained that he and L.S. "had heated arguments and discussions and verbal abuse[] came from both directions."

L.S. denied that she ever blocked P.T. from leaving a room. She said the comment about saying nice things to the psychiatrist was a joke. She said that she did call P.T. an "ungrateful asshole," but thought he was asleep and did not know he heard it: she "just wanted to say it out loud" because she "couldn't say it when he was awake."

12

## D. The Trial Court's Ruling

After receiving the evidence at the hearing, the court found that "life in Nepal for [L.S.] was anything but comfortable" and "was indeed hostile." P.T. "le[ft] her . . . for any number of months with" her in-laws, and when he was present, there were "many incidents, of violence by him, not where she was physically harmed per se, but in front of her, throwing furniture around, throwing a sofa into the courtyard, going down to the uncle's apartment and smashing the glass and cutting himself and having to be taken to the hospital," as well as "threats of self harm." The court found that P.T. "was having mental issues that were clear to everyone" and "[t]he family took him to the psychiatrist." L.S. "was going along with the family being part of that treatment" and her "role was minimal." In any case, P.T. "had been reacting so erratically and violently that the parents wanted to help him. That is what they were trying to do." The court did not view this situation as "a basis for a claim by [P.T.] against [L.S.]."

The trial court found L.S. was "very credible" in her account of events in Nepal. And the court found that after L.S. and P.T. moved to California, "clearly there was violence in their home," beginning with P.T.'s destruction of L.S.'s belongings before the children were born and continuing to the day when P.T. threw the glass. The court noted that L. personally saw P.T. remove the covers from the twins' car seats in a "violent" manner. L. saw L.S. "visibly shaken and crying," and when L.S. explained what had happened, P.T. said " '[s]he pushes me into madness' " and " 'I hate her.' " The court emphasized: "This is a dangerous cocktail." The court explained that after reviewing the text messages between the parties, it found that L.S.'s messages were those of a wife "reaching out, seeking comfort, seeking confirmation and respect in a relationship, and the vitriol that was hurled

13

back was anything but that." The court concluded "[i]t was clear through the testimony that [L.S.] is afraid and was afraid of [P.T.]" and again found her "very credible." The court then stated it "did not observe that [P.T.] was truly afraid of [L.S.]."

The trial court denied P.T.'s request for a restraining order and issued "a three-year restraining order protecting [L.S.] and the minor children."

## II. DISCUSSION

### A. *Governing Legal Principles*

The purpose of the DVPA "is to prevent acts of domestic violence" and abuse, "and to provide for a separation of the persons involved . . . for a period sufficient to enable [them] to seek a resolution of the causes of the violence." (§ 6220.) To this end, a trial court may issue a DVRO if a preponderance of the evidence shows, "to the satisfaction of the court, reasonable proof of a past act or acts of abuse." (§ 6300, subd. (a); *K.T. v. E.S.* (2025) 109 Cal.App.5th 1114, 1127 (*K.T.*).) "The statute authorizes ex parte restraining orders (DVTROs) pending a hearing (§§ 6320–6327) and long-term restraining orders (permanent DVROs) issued after notice and hearing (§§ 6340–6347)." (*In re Marriage of A.M. & R.Y.* (2025) 110 Cal.App.5th 1115, 1125.) A DVRO may be "based solely on the affidavit or testimony of the person requesting the restraining order." (§ 6300, subd. (a).)

"[I]n the discretion of the court," the order may include "other named family or household members" as protected parties "on a showing of good cause." (§ 6320, subd. (a).) "In determining whether there is good cause to include children as protected parties, the court considers the totality of the circumstances and, where custody or visitation orders are sought . . ., whether failure to make the requested order may jeopardize the safety of the children." (*M.S. v. A.S.* (2022) 76 Cal.App.5th 1139, 1144 (*M.S.*); see also

14

*J.H. v. G.H.* (2021) 63 Cal.App.5th 633, 643 (*J.H.*).)  But "[a] showing . . . of 'potential jeopardy to the safety or well-being of the children is not a necessary predicate for including them as protected parties; it is but one factor the court must consider in the totality of the circumstances.' " (*K.T., supra,* 109 Cal.App.5th at p. 1129.)

"Family Code section 6305 permits trial courts to issue mutual restraining orders, but limits them to specific circumstances."  (*K.L. v. R.H.* (2021) 70 Cal.App.5th 965, 979 (*K.L.*).)  The statute is "clear that mutual restraining orders are the exception, and 'shall not issue' unless the trial court makes specific findings," including "which of the parties is the 'most significant' aggressor.  (Pen. Code, § 836, subd. (c)(3).)" (*Ibid.*)  " 'In identifying the dominant aggressor, [the court] shall consider (A) the intent of the law to protect victims of domestic violence from continuing abuse, (B) the threats creating fear of physical injury, (C) the history of domestic violence between the persons involved, and (D) whether either person involved acted in self-defense.' (Pen. Code, § 836, subd. (c)(3).)" (*Id.* at p. 978.)

We review an order granting or denying a DVRO for abuse of discretion, and the underlying factual findings for substantial evidence. (*K.T., supra,* 109 Cal.App.5th at pp. 1126–1127.)  We ask "whether substantial evidence supports the court's finding[s], not whether . . . contrary finding[s] might have been made." (*M.S, supra,* 76 Cal.App.5th at p. 1144.)  We accept as true all evidence supporting the findings and resolve every conflict in favor of the judgment.  (*Ibid.*)  The trial court's "[c]redibility determinations," in particular, "are subject to extremely deferential review." (*Jennifer K. v. Shane K.* (2020) 47 Cal.App.5th 558, 579 (*Jennifer K.*).)  The trial court may believe or disbelieve witnesses if there is any rational ground to do so.  (*Ibid.*)

15

Finally, we "uphold the trial court 'ruling if it is correct on any basis, regardless of whether such basis was actually invoked.' " (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255.) " '[A] natural and logical corollary' " to this rule is the doctrine of implied findings. (*Abdelqader v. Abraham* (2022) 76 Cal.App.5th 186, 197.) Absent a proper request for a statement of decision, we apply this doctrine to " 'infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.' " (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

### B. Analysis

The trial court explained that its decision rested upon its determination that L.S.'s account of the events at issue was "very credible"—a conclusion it stated twice. The court found that there were "many" incidents "of violence by [P.T.]" in Nepal, "not where [L.S.] was physically harmed per se, but in front of her." And in California, "clearly there was violence in [the parties'] home," culminating in the incident when P.T. threw the glass at or very near to L.S. The court stressed that in the aftermath of that incident, the parties' neighbor, L., saw P.T. take the covers off the twins' car seats in a "violent" manner and saw L.S., who reported that P.T. had pushed and shaken her, "visibly shaken and crying." In that moment, P.T.'s response to L. was " '[s]he pushes me into madness' " and " 'I hate her.' " The court found this was "a dangerous cocktail."

The trial court appropriately exercised its discretion to issue a DVRO against P.T. based on these acts of abuse, which P.T. does not dispute. The court's implied finding of good cause to include the parties' children as protected parties is also amply supported. L.S. and L.'s testimony established that the children were near L.S. when P.T. pushed and shook her, and that P.T. "violent[ly]" removed the covers from their car seats. The

16

testimony also established that P.T. shattered a glass near L.S., causing shards of glass to spread "all over the sink, over the babies' bottle parts, . . . all over [L.S.], [her] hair, [her] clothes and [her] nursing bra." These actions put the children in physical danger. In addition, "[w]itnessing one parent's domestic abuse of another parent" as the twins did may itself "constitute abuse of the children." (*K.T., supra*, 109 Cal.App.5th at p. 1131.) The circumstances here were more than sufficient for the court to include the parties' children in the DVRO. (See *J.H., supra,* 63 Cal.App.5th at p. 643; *K.T., supra,* 109 Cal.App.5th at p. 1129.)

P.T. does not articulate how the evidence was insufficient to justify including the twins as protected parties. Rather than addressing the trial evidence, on appeal, P.T. faults the trial court for failing to expressly analyze "the totality of circumstances" and to specifically state there was good cause to include the twins. But P.T. "never raised this complaint below." (*J.H., supra,* 63 Cal.App.5th at p. 644.) Nor did he request a statement of decision. And "the court's failure to 'discuss' [the good cause] standard does not imply it applied an incorrect standard." (*Ibid*.) Error on appeal must be affirmatively shown by the record, and " '[w]e presume the trial court knew and properly applied the law absent evidence to the contrary.' " (*Ibid*.)

We also conclude the trial court was within its discretion to deny P.T.'s request for a DVRO. Again, the court expressly and repeatedly determined that L.S. was "very credible," while finding that it "did not observe" P.T. "was *truly* afraid of [L.S.]" as he claimed. (Italics added.) In other words, the court found that L.S. was credible and P.T. was not. The court viewed L.S.'s communications to P.T. as those of a "wife reaching out, seeking comfort, . . . confirmation and respect in a relationship," and contrasted her approach with "the vitriol that was hurled back" by P.T. We infer that the court similarly

did not credit P.T.'s other claims of abuse by L.S., including his claims that she impeded his movement. As to P.T.'s medical treatment in Nepal, the court expressly found that L.S. "was going along with the family being part of that treatment" and her "role was minimal." We must accept each of these assessments, even though "the parties disputed certain aspects of the events that led to the issuance of the restraining order" and P.T. "highlights on appeal his version of events." (*In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1426.)

P.T. claims the trial court applied the wrong standard by denying his request based on its finding that he was not afraid of L.S. But the court made that finding in the context of assessing the parties' credibility and did not suggest the finding was itself dispositive. We see nothing in the record to indicate that the court applied the wrong standard and must presume it correctly applied the law. (*J.H., supra,* 63 Cal.App.5th at p. 644.) And while not addressed in the parties' appellate briefing, the court was *required* to consider whether P.T. was afraid of L.S. to decide whether to issue mutual restraining orders. (See *K.L., supra,* 70 Cal.App.5th at p. 980 ["whether either party made . . . threats to the other creating fear of physical injury" is among the "mandatory factors" the court considers in this context].) We find no fault with the court's implied determination that L.S. was not a primary aggressor as would support issuing mutual restraining orders. (*Id.* at p. 978 [court shall not issue mutual restraining orders unless it " 'makes detailed findings of fact indicating that both parties acted as a primary aggressor and that neither party acted primarily in self-defense,' " quoting § 6305, subd. (a)(2)].)

Finally, P.T. fails to support his claim that L.S.'s involvement in his involuntary medication—through a process he does not dispute is legal and

18

commonly utilized in Nepal—constitutes abuse per se. To the contrary, the record revealed and the trial court found that "life in Nepal *for [L.S.]* was . . . hostile" and she faced serious consequences if she disobeyed her in-laws. (Italics added.) Substantial evidence supports the court's finding that L.S.'s actions were not what may have disturbed P.T.'s peace in this context, considering "the totality of the circumstances." (§ 6320, subd. (c).) And we draw two inferences from the court's determination that P.T. was not truly afraid of L.S., even though he had testified that the administration of medication made him fearful. First, the court questioned his credibility. Second, the court did not find that L.S.'s participation in P.T.'s medical treatment in Nepal "destroy[ed] [his] mental or emotional calm." (*Ibid.*; *Hatley v. Southard* (2023) 94 Cal.App.5th 579, 592–593 [assessing whether a party disturbed the peace of another person "includes factual and credibility determinations"].)

## III. DISPOSITION

The orders granting L.S.'s request for a DVRO and denying P.T.'s request for a DVRO are affirmed. L.S. is entitled to recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

SMILEY, J.

WE CONCUR:

HUMES, P. J.

LANGHORNE WILSON, J.

A171575 / *L.S. v. P.T.*